Welcome to the Ninth Circuit. We only have one case on the calendar this afternoon, Flores v. Barr, and I guess it's the government going first, when you're ready. I'm really uncomfortable with this light coming down, but I'm not sure we can do anything about it. Right. Would you like me to turn it off? Wait a moment. Can we yell it with about an hour when the sun's different? I think there's nothing we can do about it. With the Court's permission, I'd like to reserve two minutes of my time for rebuttal. Okay, keep your eye on the clock, and we'll try to help. I will do that, Your Honor. Good afternoon. Sarah Fabian with the Office of Immigration and Litigation from the Department of Justice on behalf of the defendants, appellants in this case. There are several issues on appeal before the Court today. I am happy to address all of them and, of course, any of the Court's questions with regard to any of the issues, but I want to start by focusing on a few points related to two of the issues. First, with regard to the District Court's finding that U.S. Customs and Border Protection was in violation of the Flores Settlement Agreement with regard to conditions in the case. Okay. Let me see if I got the basic structure of this case right as it comes to us, that we really don't have any jurisdiction over the case with respect to appointment of the monitor unless somehow the conditions of the agreement, unless the terms of the agreement have been changed. So the fight with respect to jurisdiction is whether or not all the District Court's findings as to violation of the agreement were changes to the agreement. Have I got that right? That's correct, Your Honor. I would note that in the order that's on appeal today, the District Court declined to order a special monitor. A later order did impose a special monitor on the government, and that we had had a protective notice of appeal that we've recently dismissed. So we are not appealing the later order appointing the monitor. So there was another appeal that you also dismissed, right? There were two, one that would have appointed a special monitor but didn't say who the particular special monitor or some order from the special monitor. There were two more appeals, right? There may even have been three, Your Honor. There was another appeal of an ex parte order filed by the government that was denied by the District Court that had been related to this appeal, and we subsequently dismissed it and that's what allowed this argument to go forward. There was another order, and it was actually we did appeal two orders in that appeal. It was an order appointing the special monitor, and then we had moved for partial reconsideration of that order, and that was denied, and so we had a single appeal pending for those two orders. Also hanging out there is the question of the regulation that will sort of negate all this and start it all over again, right? But that hasn't happened. There is no regulation, no final regulation. Is that correct? Correct, Your Honor. We, the government had issued a proposed regulation. That comment period has closed. I don't have any information on when final regulations will be issued that, of course, the government's position is will terminate the Flores Agreement by its terms, but whether that issue reaches this Court is, of course, a question for another day. Okay. So, but what that means is that for, in this case, we have limited, we have jurisdiction only to the degree, and I gather you agree with this, that the order somehow amended the agreement or modified it? That's correct, Your Honor. To the extent that, and that goes to Judge Fletcher's question, the, to the extent that this Court finds that the district court's order does nothing more than order the government to comply with the existing terms of the agreement, then the government acknowledges that this Court would not have jurisdiction over the appeal. Well, it certainly reads that way. In other words, her agreement, her order is paragraph such and such is enforced, paragraph such and such is enforced, paragraph such and such is enforced. That's the order at the end, right? Correct, Your Honor, and I think that is really the structure of the order. There are a few points where the government's position is that in holding the government to what the district court found were the terms of the agreement, it's our position that, in fact, she expanded the terms of the agreement. And in one of the, I believe at least one or two of the issues that we raised, another source for jurisdiction is that she, is that the district court declined to amend the agreement in accordance with statutes and regulations that have been issued after the agreement. Did you actually ask her to amend or modify the agreement? Or I thought you just argued that it didn't apply to this in light of these statutes, but you never actually asked her to modify it, did you? That would be correct, Your Honor. In the district court, with regard to those issues, what we argued is that the statutes and regulations really required that certain provisions of the agreement not be enforced in the way that the court eventually did enforce them. So do we have jurisdiction over that? Because that argument, as you just presented it, is not that the agreement has been changed, but rather that the agreement is no longer enforceable in light of subsequent law, correct? And do we have jurisdiction then when your argument is not that the agreement has been changed, it's no longer compliant with law, do we have jurisdiction over it if that's the frame of the argument? There would be jurisdiction if the district court declined to modify, is the language of the statute. But did you ask the court to modify? I would say that we did not directly ask the court to modify. What we did was ask the court to read the agreement in conjunction with the later issued statute. So to the extent that she, that the district court read the agreement ignoring the later issued statutes, then we would argue that that meets the requirement of declining to modify or declining to read the agreement in conjunction. I kind of smell we may take you over time, but don't worry about that. I think I'm being kind of pedestrian about this, but I want to make sure I'm really understanding the jurisdictional issue because the jurisdictional issue really smells an awful lot like merits. So for example, the agreement says that the facilities in which we have the confinement or the detention have to be safe and sanitary. If we were to hold that the requirement of toothbrushes doesn't come within safe and sanitary, then we have jurisdiction because that's a modification of the agreement. That's the argument? That's correct, Your Honor. I would, yes, to put it simply, that's correct. I'm trying to put it as simply as I can as we work our way into it. Okay. Let me ask a further question along the same lines. In examining those questions, now, you raised a number of what I will call the factual sub-issues. Now, the jurisdiction to hear your appeal on your contention that somehow some of these orders amended the underlying consent decree, does that carry with it the jurisdiction to examine the factual questions that you raised? I mean, such as, you know, for instance, you make some hearsay objections, right? Correct, Your Honor. Can we look into those? I have asked myself that same question, and I think that the answer is that if the Court finds that there was no amendment to the agreement, that there would not be jurisdiction to reach our evidentiary issues. I wish my answer was different, because I think those are important and would like the Court to reach them. But I believe my understanding of the statute would be that if the Court finds no jurisdiction to hear the appeal in general, then I can't see how the Court would have jurisdiction. It might be most productive, at least for me, to hear. I mean, your statutory argument is TIVRA, right? That TIVRA, T-V-R-A, and maybe also the earlier statute, revised the—I couldn't quite understand this, sorry—revised the process for releasing minors, and therefore the agreement doesn't prevail? Is that essentially your argument? Sure, Your Honor. Turning to the statutory question, I'm happy to do that. I would say—I would note that what we're appealing is sort of—we have two issues that we're appealing with regard to a more singular finding of the District Court, which is what is the impact of both the INA and the T-V-P-R-A on ICE's detention authority and how that impacts the employer's agreement? This is what I don't understand. As I understand the thrust of your argument in that regard, it's that DHS doesn't make these release decisions, ORR in HHS makes them. Is that the thrust after TIVRA? That's correct. And that is the— But what difference does that make? I mean, what we—isn't ORR essentially a successor, just as DHS is, to INA in this Is it because ORR isn't a formal defendant here, or what's the problem? I think, Your Honor, the position is the District Court held that ICE would be required to make suitability assessments and to release children out of ICE family residential centers. All right. And if we said, no, ICE doesn't have to do that, ORR did, you'd be happy? Yes, Your Honor. Our position is simply that the TVPRA has put that function of assessing suitability for release to HHS, and that ICE, as we raised in the District Court, ICE is simply not qualified to do that. And I understand the District Court's sort of conclusion that ICE shouldn't be allowed out of that simply because they're not qualified, but the fact is that they're not qualified because the TVPRA has put that authority and put that mandate onto HHS, and they are the ones with the expertise in that process. But if that's so, I mean, doesn't the agreement run against the government rather than against a particular subcategory of the government? I mean, so why is that a change that's relevant to the agreement? Well, Your Honor, the change, the District Court held that it was specifically ICE was finding no suitability is in fact part of the Flores Agreement, and that was then codified to some extent in the TVPRA, which put that particular portion. But you would agree that the agreement still binds the government, writ large, including ORR, to the terms of the agreement? Correct. Your Honor, I think our concern there was really the District Court's holding that ICE is obligated to conduct those findings. Well, let me follow up on that now. So, your contention then is that ICE doesn't have that authority after the TVPRA was enacted. Is that right? In other words, that authority is now with ORR? Correct, Your Honor. So it was a, it was what, what is that, I mean, erroneous conclusion of law to say that ICE had that authority? Is that your contention? Correct, Your Honor. But, now, what can we do with that? Can we say, for instance, well, ORR has the authority, so send it back to the District Court and tell them to look at it from the point of view that it's ORR's obligation? I think, Your Honor, what I would say is that, that here, the District Court has essentially, I mean, these are the challenges of interpreting a very old agreement that was designed with the INS in mind, which, you know, is no longer around. And so, I think, to the extent that the District Court really read the agreement to, and it on to the new agencies, to apply specifically to this agency, and that it would be, this court could re-band to the District Court, I believe this court could find. So is your problem on this particular point only as to what part of the government's been directed to do this, rather than what it has been directed to do? Correct, Your Honor. That seems pretty easy. And maybe if we do have jurisdiction, because it's a modification of the agreement, we have jurisdiction, we'd say, on that particular and fairly narrow point, we send it back to the District Court to say, we'll change it to ORR, end of story. That's easy. But that's all you're asking for with respect to this point? Correct, Your Honor. Well, that's easy. Was this even, is this even in the District Court opinion as such? It is in the, and I see I've reached my time, but I'll keep answering your questions. I already told you we're going over. And you haven't even started your argument yet. Yes, Your Honor. To the extent, what the District Court said is that ICE is required to conduct this analysis, and it was in requiring ICE to conduct the analysis. But did you bring this very technical problem to the District Court's attention? You mean in our briefing to the District Court? Yes, to the District Court. I'm not finding it. I'm looking through her opinion, and I'm not finding it. Sure. Let me. It's not very important, but I just think that this is sort of the tail wagging the dog, so let's go to the dog. Okay? Okay. Now, with all of your time expired, would you like to begin your argument? Sure, Your Honor. Well, I want to make sure that I've addressed the Court's pre-argument questions first. In asking about the statute, there's sort of two pieces to our statutory argument. The TVPRA piece is one of them, and then another issue that we had raised was with regard to the parole regulations, and really how . . . Okay. So you discuss one parole regulation, but there's another parole regulation, which applies, as I understand it, generally to people in mandatory detention and includes release of juveniles, 215 point something or other. Sure.  And you never discuss it, and you just make believe it isn't there. Well, Your Honor, I don't think that we would contend that it isn't there. I think the government's position is that 212.5 applies, and it applies by its terms after someone is found to have a credible fear. The statute, and that is 235.3c, sorry, the regulation at 235.3c, then points back to 212.5b as controlling release. 212.5b can apply in conjunction with 235.3b42, which is what we argue also must apply in looking at parole for individuals who have not yet been found to have credible fear. And that is our position here, is that to the extent the court, the district court read out the 235.3 piece for individuals who have not yet been found to have credible fear, that the court erred in applying only 212.5b. And I would note, I think, that in their opposition, plaintiffs did say, of course, as I read it, they said that 235.3b could still be applied in conjunction with 212, and we agree with that. And so if that is plaintiff's position, then I think we agree. But our understanding of what the court was ordering was that ICE could not apply the 235.3 standard, and was required only to apply the 212.5b standard. I'm fairly confused, but I guess I'll have to read the standards more specifically. I would agree that it is... The following of aliens within the following groups who have been or are interchanged in accordance with 235.3b or c, and that doesn't include the people who are in expedited removal? Well, 235.3b refers to individuals who have not yet been found, though they are in expedited removal, and they have not yet been found to have a credible fear. Okay, and 212.5 says the parole of aliens within the following groups who have been or are detained in accordance with 235.3b or c would generally be justified only in a case-by-case basis, and then it gives a list of people, and one of them is 236.3a. So why doesn't that directly apply to the group under 235.3b? We would agree it does directly apply, but it doesn't read out of the picture 235.3b. But you read 235.3b limitations as exclusive and saying that unless they have an emergency medical or they're involved with law enforcement, they can't get parole, unless they're detained in accordance with 235.3b and they're juveniles, they can't get parole. I would dispute that reading, Your Honor. I think our position is that for the reference to 235.3b incorporates the limitations in that section, and that then it notes that those individuals can get, if they're not deemed to be a flight risk, can get parole. But for individuals who fall under the requirements of 235.3, those individuals must first meet the standards of that regulatory section, and then... I don't understand how that can be when this section here says 212.5b says that this section applies to 235.3b individuals and then gives criteria, one of which is juveniles, I'm mystified. It specifically says so. But it doesn't say that it overrules or it overcomes the standard that initially must be found in 235.3. And I would note that what this says is simply how, in determining under what conditions, a juvenile should be paroled from detention. So if the juvenile is to be paroled in accordance with the standards of 235.3b, then this, then 212.5, would dictate the conditions on how that parole would... So, for example, two women who have been medically certified as pregnant is not in addition to the list of people, list in the other section, so that those people really can't be paroled after all. I think our position would be that for all of the categories listed in 212.5, before... But first you have to meet the other criteria, which are exceedingly narrow and don't include women who have been medically certified as pregnant. Well, yes. I think all of those categories... So how do you get women who have been certified as pregnant back up under the other one so that the other one is a meaningful sort of qualification? Restriction, but a pregnant woman is able to qualify. How do you do that? I'm not sure I understand your question, Your Honor. You've got two sections. You say, in order to get the later criteria, which for our purposes really means juveniles, you need to qualify under the earlier section of the criteria for parole. So I'm asking you, how do you get pregnant women to fit under that under any circumstances? I mean, I'm basically asking Judge Berzon's question again. I think all of the categories in Section 212.5, and that would include the, you know, Category 2 that Your Honors are referencing, all of those individuals, to the extent that they have not yet been found to have credible fear, also apply under 235.3b. Meaning they can't be paroled. They cannot be paroled even though it says they can't be paroled. Well, no, meaning they can be paroled, but under the more narrow standard in the 235... Which are what? What's the standard? That is, parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. Being certified to be pregnant isn't good enough. If you have to have a medical emergency. Well, I think that that part would be first. Is that 235.3, the first analysis is that they have to meet the requirements for parole there. But here's the problem, and I think you recognize it. It's really hard to say that simply being pregnant is a medical emergency. And it's really hard to say that being pregnant is a law enforcement purpose. So it's possible, in fact even likely, that there are going to be some pregnant women who look as though they are eligible for parole on the later section, can't qualify because they can't fit through the gate that you say they have to get through first. I mean, that's the question. So how do you get those two criteria satisfied when the only thing you've got is that the woman is certified as pregnant? Well, and I think what I would note is that the 235.3b was a later enacted regulation, and it was intended to implement 1225b and to create a more restrictive standard for individuals who are still pending their credible fear findings. Well, but it didn't say 215. I'm losing my numbers here. But the other regulation, 212.5 notwithstanding, it doesn't say that. Anyway, so there's that. What else would you like to argue about? I want to talk about toothbrushes and so on and safe and secure, certified, confined. I mean, what do you want to talk about? There are so many things, Your Honor. I was planning to address the CBP issues, but I'm going to. What issues? I'm sorry. The Customs and Border Protection, which is CBP. That's the conditions in the CBP facilities. Okay. But you're really going to stand up and tell us that being able to sleep isn't a question of safe and sanitary conditions? Your Honor, I think what I'd like to stand up and say is that is to focus the court on what the question is here in this appeal. And that is, this is a consent decree, and it is focused on the language, the four corners of the language in the consent decree. And what I do want to note is that what the court, what the district court looked at was not asking the question, is there a violation of the language of the consent decree, and is this an overall violation of what the parties intended to prohibit in the consent decree? That's not, the district court instead looked at it from a different angle. The district court looked first, was there a violation of CBP's own TED standards? Well, I'm not sure she did that first, and I'm not sure that the TED standards are really all that different from the more general statement or category or requirement of the agreement. Yes, the TED standard is more detailed, but that sounds to me as it could quite easily come under the more general category of safe and secure. Well, Your Honor. Safe and sanitary, sorry. And that's, any number of things might fall under those categories, and I think we can. Yes, but sleep surely does, right? You can't be safe and sanitary or safe as a human being if you can't sleep. Well. And you said in your briefs it doesn't say anything about sleeping, so therefore there's nothing in here about being able to sleep. I think the concern there is, Your Honor, the court, finding that sleep, for example, is relevant to a finding of no safe and sanitary conditions is one thing, but the ultimate conclusion is safe and sanitary is a singular category in the agreement, and it was, one has to assume, left that way and not enumerated by the parties because either the parties couldn't reach agreement on how to enumerate that, or that it was left to the agencies to determine. Or it was relatively obvious, and it's least obvious enough so that if you're putting people into a crowded room to sleep on a concrete floor with an aluminum foil blanket on top of them, that doesn't comply with the agreement. I mean, it may be that they don't get super thread counts Egyptian linens. I get that. But the testimony that the district judge believed was it's really cold. In fact, it gets colder when we complain about it being cold. We're forced to sleep crowded with the lights on all night long, and all you had to put us on is the concrete floor with an aluminum blanket. I mean, I understand at some outer boundary there may be some definitional difficulty, but no one would argue that this is secure and sanitary, safe and sanitary, or at least I don't think you're arguing that. Are you? Your Honor, I think what I'm arguing is that the way that the district court reached the conclusion was to say these specific items. And I think I will acknowledge I think sleep is the more difficult end of what I'm arguing. We actually have an opinion that says that it's unconstitutional to make homeless people not sleep. Right? Correct, Your Honor. And I mean, I do know, and I think that's part of our point, though, is that we're not talking about the constitutional standard here, and we're not talking about what CBP has implemented more broadly as its own TEDS policy. We're talking about – But are you arguing seriously that you do not read the agreement as requiring you to do something other than what I've just described, cold all night long, lights on all night long, sleep on the concrete, and you've got an aluminum foil blanket? Are you saying that that's okay under the agreement? I took credit to lie down, which they also said. I find that inconceivable that the government would say that that is safe and sanitary. I think what I'm arguing, Your Honor, is that I don't believe that the district court made the finding in the way that Your Honor just detailed it. Everything I just said comes right out of the district court order. I think our concern is that the district court really looked at a condition, and again, as I said, I think sleep is clearly at the sort of one end of her findings. I think we also look at— Which is her strongest argument, then? Well, I mean, I think what I would go to is when you start enumerating, for example, specific hygiene items, and the way that was done is that the court sort of enumerated these and said these fall under the rubric, these fall in the category of what could be required. Again, it wasn't Perfume Soap. It was soap. It wasn't, you know, high-class milled soap. It was soap. And that sounds as though that's part of safe and sanitary. Are you disagreeing with that? What I'm disagreeing with is that the court ultimately concluded these things would fall under here, and then simply by not providing them, you have violated that tenet of the agreement. And I also would note that in that particular— Well, what do you — granted that the decree, you know, doesn't have a list of items that has to be supplied in order to be sanitary, what's a reasonable — in your eyes, what's a reasonable definition of sanitary that the court could enforce? Well, I think what I would ask is — what I would say is the court — I would ask that the court find that the conditions were not safe and sanitary. What the court found is these things fall within that category, and by not providing them, that's an automatic breach of the agreement. Well, I don't know if it's automatic, but to me it's more like, as Judge Fletcher says, it's within everybody's common understanding that, you know, if you don't have a toothbrush, if you don't have soap, if you don't have a blanket, it's not safe and sanitary. Wouldn't everybody agree to that? Do you agree to that? Well, I think it's — I think those are — there's fair reason to find that those things may be part of safe and sanitary. Not may be. Are a part. What do you say may be? You mean there are circumstances where a person doesn't need to have a toothbrush, toothpaste and soap for days? Well, I think in CBP custody there's — it's frequently intended to be much shorter terms. So it may be that for a shorter-term stay in CBP custody that some of those things may not be required. Yeah, but I don't think that was the situation that the court was confronting. I mean, it wasn't as though those people were there for 12 hours and then moved on to the Hilton Hotel. No, they were there for a fairly sustained period. And at least according to the evidence that the judge believed, they weren't getting these things for a fairly sustained period. Well, I do want to clarify that the judge did find that in Ursula, in one of the CBP facilities, that many of those things were present. Correct. Right. And that the evidence did show that minors spent a much shorter period of time — that there was only a small percentage of minors who weren't moved to Ursula very quickly. Just to clarify, at some point in your brief you appear to be saying that safe and sanitary has no independent meaning and that the following — there's another sentence that follows it that has some details, and that's the only thing you're required to do. I don't understand you to be arguing that now. Is that correct? That's what your brief said. Right? Your brief seemed to say that safe and sanitary had no independent meaning. I don't think it has no independent meaning. And if that's the impression our argument gave, I apologize. I think that the position is, more generally, that to impose specific enumerated meanings that were not contained in the agreement, without in fact reaching the ultimate question of were the conditions overall, in general, as a general matter, safe and sanitary, is not a correct finding of breach. No, but you see, under that approach, if the district court were to conclude no, they were not sanitary, and all it could do is say fix it, they couldn't tell you what to do, right? They couldn't say you have to provide it. So all they can do is issue an order saying make it sanitary? Right? I mean, that's what the details are there for. Isn't that the purpose, to give concrete meaning to the term? I think... I mean, you know, if CPB got an order saying, you know, we want your facilities to be sanitary, let's say fine, we'll make them sanitary. But, you know, I mean, who knows what sanitary is? And I think that then goes to what level the agreement could be enforceable. It's just... That's part of what I'm getting. So you're saying maybe the agreement is so vague that it's unenforceable. That's almost your argument, isn't it? To some extent, yes, Your Honor. I think that if the term in the agreement requires an after-agreement interpretation by the district court, then yes, that does constitute a vague term that the parties didn't sufficiently clarify in reaching agreement. You know, let's hear from the other side. And we've taken you 18 minutes and 52 seconds over time. But we will give you a chance to respond. Thank you, Your Honor. You lost a piece of paper. There's a piece of paper that's... I don't know what it is that fell down. Thank you. May it please the Court. Peter Shea for the plaintiffs. I guess I'd maybe like to start with the issue you were grappling with about... I'm sorry? ...releasing children to non-parents and the argument in the appellate brief by the government that somehow if it was going to release to a non-parent that would convert that child to an unaccompanied minor and therefore only under the TVPRA of 2008... Well, even if it did, I mean, I... It seems to me there may be something in that, i.e., if they're not going to be able to be taken care of by their parents because their parent is in detention and after the last iteration of this case, you're not going to get that parent freed because of this agreement. But still, I don't... Maybe I'm missing the stakes here. But whether it's whoever it is, whether it's ICE or ORR, if they're still banned by the agreement, what difference does it make? Well, it's... I guess the first point I would make is that that's an argument they never made to the district courts. Well, that may be true. That may be true. And if you look at page... Judge G deals with their argument about why ICE will not, even though the settlement says that from the time of apprehension, the defendants will make and record prompt and continuous efforts aimed at the release of children under paragraph 14. And the settlement doesn't say, oh, if the child is with a parent locked up by ICE, somebody else has to make that evaluation. Help me to know why you care. If the agreement is still binding on ORR, then why do you care? Well, we... It is binding on ORR. Right. Okay. So, therefore, why do you care? But as a practical matter, to... If a child is in ICE custody, then under the terms of the agreement, it is ICE that has that kid in its physical custody. Okay. But their position is, well, ICE has to hand it over to ORR. Well, if they don't hand it over to ORR, then they have a problem under Tiverton. If they do, then ORR is still bound by the agreement. So what's your problem? Well, of the tens of thousands of children who have been detained by ICE, the government cannot point to a single case, and we're monitoring this all the time, we're not aware of a single case in which a child has been transferred from ICE to ORR just so that... And they've got a major... So then if they're coming here and telling us that that's what they're supposed to be doing, then they've got a major problem. That's what they're telling us. They're telling us that they're supposed to be handing them over to ORR, and now you're telling me they never do. Well, that's a big problem. They never do. It may not be this problem, but it's a big problem. And right today we have a situation where once a month a kid is dying in CBP custody because... Well, maybe you're much better off with an order then that says that they have to hand them over to ORR right away, because that's what they're saying. They're not turning them over because ORR has no bed space. Well, you know, it sounds to me as though this is something that's better addressed by the district court, the first instance. It doesn't sound as though the district court was even made aware of this issue. It wasn't. And if you look at the argument they made in the district court, which the court addresses in some detail at page 26 and 27, they don't argue anything close to the notion that these kids are unaccompanied because they're not. I mean, the statute, you cannot just take any child and transfer that child to ORR. Under the terms of the settlement, paragraph 14.18.19, whoever has custody of that kid, Border Patrol, ORR or ICE, is supposed to make and record continuous efforts aimed at the release of that child to a list of relatives listed in paragraph 14. And the only thing that ICE argued in the district court, and the court discusses this in detail at pages 26 and 27, is they just said, they didn't say anything about the TBPRA. They just said, oh, ICE doesn't have the capacity or the expertise to do this. You cannot take under the Federal statute, and they never have taken a child who is unaccompanied and suddenly define that child as an unaccompanied minor simply because the mother says, I would like my child released to my mother, the child's grandmother in San Francisco. That is supposed to trigger, and historically has triggered, a brief investigation. Certainly, they can assess the household, and they should assess the household. But that triggers a brief investigation into can the grandmother, is the grandmother willing, capable and able to take care of that child. That's taking place while the child is with the mother in a family detention center. Under Federal law, you cannot suddenly define that child as an unaccompanied minor just because the mother said, I would like the child released to my sister. Now, once, if the ICE determines, as it historically has for 33 years, that the grandmother is a good placement, and they place that child with that grandmother, even then I don't think you can define that child as an unaccompanied minor, nor has the government ever done that. So it would simply create an administrative nightmare with no written procedures about how to follow that. Let me interject again. Yeah. Is this issue properly before us, given that it has not been presented to the district court? I don't think it is because, again, we within district court, we would have responded to this argument sort of the way I'm responding to here had we had that opportunity. But that was never the argument. Their argument was much vaguer. They submitted a declaration, and it's cited right in the first, second, third, fourth paragraph of page 26 of the excerpt of records. And if you look at the fourth paragraph, the judge says, according to the ICE declaration, ICE, quote, lacks the institutional capacity or resources to assess whether an adult, other than a parent or guardian seeking custody, is a suitable custodian. That's all they ever argued there. They didn't argue anything about the TVPRA and whether, and really under the TVPRA I'll say it again. Yeah. You've convinced me that that issue is not properly in front of us. I don't know about my colleagues. Okay. Well, perhaps. Let me ask you. Let me ask you to address this question, which government counsel addressed, which is that the district court's approach to deciding what was and was not sanitary went way beyond the words of the agreement itself, and that, you know, the word sanitary or safe and sanitary doesn't necessarily encompass a toothbrush and a toothpaste. Yes. What's your response to that argument? You know, my response to that question, and of course the underlying question is did she substantially, according to the case law, it's not just did she change it, did she substantially change it. So I think we're all in agreement. And I think part of the argument must be that, well, by giving this construction to the word, you know, safe or safe and sanitary, the court amended the consent decree. Correct. And increased the burden on the government. Correct. I mean, that's the argument, that it substantially changed it. Making it an appealable question. Exactly. So let me respond. That's a good question. So as we understand it, in addressing issues of compliance, the court turns to California law. It's contract law. And I'm not an expert in that contract law, but I think generally terms in an agreement have to be reasonably interpreted. Like what was the reasonable intention of the parties? I think that's fair to say. When one looks at these terms, and there's really three terms. There's safe. There's sanitary. And there's paragraph 11, which says defendant shall treat all minors with dignity, respect and special concerns for the particular vulnerability. So you have those three constellations of ideas. So when you look, when you're doing this kind of, it's not statutory construction, but construction of the terms of a consent decree, I think the first thing you do, Your Honor, is you turn to just the plain meaning. Just what's the plain meaning? And I think sanitary is an adjective. It generally means to be free from dangers to one's health. If you look up the Webster's Dictionary, and I'm not positive we had the Webster's Dictionary with us when we were negotiating this settlement, but it's as good a guide as any to what does this mean. Webster's Dictionary defines sanitary as, quote, of or relating to health. If you look up the word ---- How about clean? Is clean in there anywhere? Sanitary sounds like it has some relations to cleanliness. You know, I think you would then have to keep looking at further definitions to get to clean. But I think that what the Court was looking at was a reasonable interpretation of safe and sanitary. Safe, if you look up that word in the dictionary, it means free from harm or risk. So we ---- Well, you know, it also means secure, doesn't it? I'm sorry? It also means secure, doesn't it? And it does also mean secure. And certainly the Border Patrol facilities are secure, but they're not safe and they're not sanitary. So let me just back up in two regards. Yes, please. First of all, is your position ultimately that we have no jurisdiction because all of these interpretations are simply an enforcement of the written words of the agreement and nothing more? Yes, absolutely. Bottom out position is ---- I'm a little mystified by this notion that we don't ---- In this instance, she wrote the agreement to say paragraph such and such is enforced, paragraph such and such is enforced. Correct. In the 2015 agreement, she wrote the agreement, the order to say the defendant shall do X. Correct. And nobody thought that that was not an appealable order. Correct. Right? Even though it was in essence an order that they comply with the agreement, as she interpreted it. Correct. So how is this different? It is different in this way. That in 2015, we were dealing with these issues for the first time. And so we saw orders actually enforcing different parts of the settlement. We were somewhat frustrated when I was before this court. I think it was a different panel. But I was before this court in 2016. And at the same time, we were conducting monitoring in 2016 as were permitted to do, and we came to believe, based on declarations that we gathered from people in custody during that monitoring, that they were still not complying with the settlement or with her 2015 order, which at the same time we were in front of the Ninth Circuit dealing with. And so we were perhaps overly cautious. And as Judge Gee. We are at court, and these questions are jurisdictional. Right. And the question is, what is the difference between those two orders? I'm getting to that. And so if you look at page 1 of her order, which is excerpts of record at page 1, she makes very clear that, and I'll quote her, plaintiffs only requested that the court appoint an independent special monitor to ensure defendant's compliance with the agreement. So it was very different from 2015 when we brought our first major motion to enforce and we wanted her to order enforcement, paragraph this, paragraph that, whatever we thought they were violating. We seriously thought in 2016, what do we do? Do we bring a motion for contempt or do we do this? Do we tell her for the second time to order them, for the second time to do this? And we made the decision as class counsel to seek the appointment of an independent monitor. And that is the only thing we sought. And in fact, she denied that. Now, she's more recently, I don't know if your clerks have been following the case, but more recently she did appoint a special. Kagan. We were told that and we were told that the appeal from that has been dropped. Exactly. And they appealed that, which sort of makes this whole exercise here seem kind of fruitless. By the way, before I forget, this is off the record. But did that answer your question? I'm sorry. Well, it doesn't exactly answer my question. I understand what you asked for. But I still don't know why the order in the form that it issued, which before it got to the question of the monitor denying the special master, but saying you should have this internal monitor, has these four or five paragraphs that say paragraph such and such is enforced and paragraph such and such is enforced. Is the monitor proceeding with some work now? The monitor is doing great work right now. Does the monitor have a task to make a report to the court by such and such a day? The monitor has a report due any day. And according to an order, and I don't have the docket number, but an order that the court issued just a week ago on June the 10th pursuant to a stipulation that we reached with the government because we filed another motion to enforce about a military-style camp that they're running with 2,000 children in Florida, an unlicensed facility. So we filed an important motion to enforce, and the government and us agreed that that is being submitted to the special monitor for mediation and really a preliminary adjudication. But that's not this monitor. That's an external independent monitor. That's an independent monitor. And so we're meeting this. That's going forward now. That's going forward and we're meeting with the special monitor Thursday and Friday this week in Washington, D.C., and the judge in this order that she issued on June 10th has in essence, I don't know what the exact word is, but kind of deputized the special monitor to hear that motion, deal with that motion. We have filed a non-confidential brief. Government just yesterday or the day before filed a brief. We're all meeting on Thursday and Friday. And then the judge said in her order of June 10th that, of course, if anybody is dissatisfied with the resolution that the monitor orders, that we have the right to appeal. It's kind of like functioning as a magistrate judge. To us? To her? To her. All right. And then will there be an appeal here? Yes. Well, I hope not. But if necessary, we'll be back here. I'm hoping it will get resolved by Friday, 5 p.m. Eastern time. We'll see you on Monday. But just to wrap up, my response to him. One other piece of the issues that I'd like you to get to, not necessarily the second, is about the license and secure question. Sure. I mean, yes. Now, question A, is that essentially precluded by the earlier opinion? I.e., it's already been resolved? Wait. What was the question? The question. Their position is that the license and secure requirement, or not secure, can't be applied to family facilities because there's no licensing for it. Correct. That's their position. Was that litigated in the 2015 proceedings? That was also part of the 2015, and that was part of her order in 2015 that this Court affirmed. So it's your position that that's over with? It's essentially they're relitigating the same thing? I mean, yes, I think so. That her position, there might be a couple of ways to look at her position. I think one way to look at it is to say, well, fine, then hold these children with their mothers in a licensed facility. States do issue, like California and other States, do issue licenses for sort of group homes where a mother might be with a minor child. Well, their representation is that they don't. Or that, at least in the States in which they have these facilities, there is no available license. Yeah, and then the other point that I recall. So what about that? Well, the other point that I recall her once making was, well, if Texas doesn't provide that, maybe you need to find a State that does. For example, I think, at least they seem to think that Pennsylvania does, because they have a small family detention facility in Pennsylvania, and there's some sort of ongoing administrative litigation there about whether Pennsylvania permits it or doesn't permit it. And they've taken the position, oh, it does. I guess somebody else has taken the position, no, it doesn't. So I think Judge Gee's position was, well, then maybe you need to do your family detention somewhere else. If Texas doesn't permit it, then do it somewhere else. But at the same time, and I'm not, I confess I'm not totally up on this, but at the same time, I know that there is ongoing litigation in Texas about whether they can get this type of license. The folks that they give the money to to run those facilities have lobbied very hard in services to provide them with a license. And that is an ongoing matter there. I think my time is way up. Oh, yes. So, I mean, I'm happy to answer any more questions, but I'm also happy to sit down. Any further questions? Nope. Okay, thank you very much. Okay, thank you very much. Now, we took the government well over time. Would you put three minutes on the clock, please? I just, I wanted to see if I could hopefully answer a few of the jurisdictional questions, maybe shed a little more light on that. As to Judge Berzon's questions about the last appeal, one thing I'll note is that in our notice of appeal on, in our briefing on that 2015 appeal, the government asserted jurisdiction under 1291. The panel then found jurisdiction under 1292 without, really without comment. And so I think part of the — Remind me of those numbers. Was 1292 a preliminary injunction? Correct. And 1291 was a final order. So we had asserted that in our brief. The court then found jurisdiction under 1292 as a preliminary injunction. I mean, there's a real murkiness, and there's this interesting Judge Posner opinion about what happens in post-consent decree proceedings. The consent decree is a final order, and then you have this, all these post-decree proceedings, and at what point does a final order is extraordinarily murky, which I hadn't realized before. Correct. And I think that's, that's maybe some of the confusion. That issue was never briefed. But an injunction is extraordinarily murky. I mean, in other words, when the court says do what you already promised to do, that doesn't seem to be an injunction. But if it says, but maybe some phrasing otherwise, like you must do exactly X, and this order doesn't really read the first place way, but you seem to be reading it the second way. Well, and I think that gets to sort of why I wanted to point that out. That hadn't been argued in front of the prior panel, and I think it clarified our understanding of this Court's understanding of the jurisdiction when, you know, to be under 1292, which is why we raised the issue in this brief to acknowledge the limitations of that section. And then I think, to Your Honor's point, what, and maybe, I think that helps understand the sort of two ways that we would read this, is that if what the district court said is that you are, I am finding that you are now obligated per se to comply with your TEDS policies, comply with these enumerated items. Sotomayor She never said that. She surely never said that. And so if that's, if the court finds that in fact that's not what the court said, and if truly this is, these enumerated conditions may be part of an unsanitary finding, and if the court is saying they're not new requirements, they're not added requirements, and they're not, it's not a direct finding that these are obligations, then, in fact, if the court is simply ordering compliance with the existing term of the agreement in a way that can be understood, then that's what the order says. Then I think in that position we would understand there to be no jurisdiction for this Court to hear. Let me ask a question. The ultimate revival of the internal monitor issue was moved, right? Because eventually we went to an outside independent monitor. No. What the district court did was provided for a year of monitoring by the juvenile coordinators in this particular order that's on appeal. Right. After a year of monitoring by the juvenile coordinators, the district court decided that that was insufficient and ordered a special, it was titled special master independent monitor. Right. So it's not, so therefore the question of whether, so what, I mean, I'm wondering exactly what's the live issue here? Well, Your Honor, what the monitor is monitoring is compliance with this particular order. And so if this order, if the court were to overturn the conclusions in this order, then we would also then go back to the district court and challenge really with a motion for reconsideration. You might go back and consider whether you really want to continue this appeal. There doesn't seem to be a whole lot left of it, considering that life is so moved on by it now. I mean, we're looking at this anciently old record at this point, and you know, there's going to be a master and there's going to be a report and there's going to be a whole, you know, more sets of litigation about what's going on now. And there's going to be a regulation hopefully someday. I just feel like we're litigating ancient history at this point. And Your Honor, I think that's fair. I think things have moved on. I think the regulations, I understand from a press release yesterday that plaintiffs may file a new motion with regard to border patrol very soon. And so I want to say that one of the issues that may still be very live is the evidentiary issue, which we didn't discuss here today. I think it's well laid out in our briefing. It's really hard for us to get to it jurisdictionally. I understand, Your Honor. And as I said, that's why I say if there's no jurisdiction, then unfortunately the court won't have the opportunity to address those issues. But I do think those are still alive. And also specific to this instance, because I mean, if once you know what the district court's position is and if she reiterates it again, i.e., if you want to cross-examine person X, you have to say that you want to cross-examine person X. I mean, it's not that hard to do that, and then they have to bring person X. So at best you have an example of just confusion. I would agree, except that I'd note that this motion had 106 declarations. Name them all. You know what? Here's my strategy. Name all of them. At that point, the other side is going to say, you know, we don't want to ring them all. Why don't we reduce it to 20? Well, and we did. We did ask for that in this case. When we understood that that was what we were being asked to do, I would note in the record that the judge specifically said that that would not have been allowed at the time, and it's not going to be so. So it mean, with the conjunction of the most recent motion, there were 80 declarations. There were 400 possible declarations. I mean, this may be that would be our approach, Your Honor, and it seems. But she never got to the point of saying how many of the 100 she would have allowed because her position was that you would waive all of them. Correct. I think if you know, I can point. So you just straighten it out next time. And then if she says, well, you can't cross-examine all 100, you can only cross-examine 20, then you can come complain to us. I expect we would, Your Honor. Especially if you cross-examine 20. Let's imagine you totally destroyed any testimony that he did, and then she relies on the testimony of the other 80 that she didn't allow you to name. Then you've got a case. Understood, Your Honor. Okay. If Your Honors have any more questions, otherwise I'll sit down. Thank you very much. I'm sorry for taking both of you over time, but that's what happens when you only have one case. Okay. Flores v. Barr, submit it for decision. Thank you.
judges: Tashima, W. Fletcher, Berzon